PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 22-1786

_____

UNITED STATES OF AMERICA

v.

JAMES CHANDLER,
                                        Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-21-cr-00049-001)
District Judge: Honorable R. Barclay Surrick

_____

Argued

April 26, 2023

Before: JORDAN, KRAUSE, and BIBAS, *Circuit Judges*

(Filed: June 11, 2024)

_____

Abigail E. Horn                    [**ARGUED**]
FEDERAL COMMUNITY DEFENDER OFFICE
EASTERN DISTRICT OF PENNSYLVANIA
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106
*Counsel for Appellant*

Eileen C. Geiger                   [**ARGUED**]
Justin Oshana
U.S. ATTORNEY'S OFFICE
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
*Counsel for Appellee*

_____

OPINION OF THE COURT

_____

JORDAN, *Circuit Judge*.

James Chandler used a fake gun to twice rob on-duty United States Postal Service employees. In one of the robberies, he also kidnapped his victim. His use of what appeared to be a revolver was meant to scare his victims into compliance, and it did. The District Court therefore did not err when it enhanced Chandler's sentence for using the replica gun in the robberies and the kidnapping, nor in accepting his guilty plea to armed robbery charges. As for the kidnapping, Chandler's motivation was, at least in part, that the mail carrier was a government employee, so a further sentence enhancement was justified. We will therefore affirm his conviction and sentence.

## I.    BACKGROUND

Early one evening, a uniformed mailman parked his delivery truck in West Philadelphia and began his rounds. Chandler walked up behind him, pulled out what appeared to be a handgun, and pressed the muzzle to his back. Chandler was wearing a blue zip-up sweatshirt emblazoned with the letters "USPS." He threatened to kill the mailman and demanded packages, cards, and cash. He then forced the mailman to get into the back of the truck, before fleeing with four packages and several dollars.

A few weeks later, Chandler struck again. This time, the victim was a mail carrier who had parked her mail truck in West Philadelphia, half a mile from the location of the first robbery. Chandler, wearing the same USPS sweatshirt, again approached from behind and pointed the same fake revolver at his victim. He made her open the truck and put about three dozen packages into sacks. Under duress, she drove him to an address a mile away. Chandler then fled with the packages.

The next day, police arrested Chandler. In his waistband, they found the revolver, which turned out to be a gun replica that could not be fired. The postal carrier he robbed identified him and he confessed to stealing packages. He consented to a search of his apartment, where postal inspectors found the blue zip-up USPS sweatshirt stuffed inside a pillowcase.

Chandler was charged with two counts of armed robbery of a postal worker, under 18 U.S.C. § 2114(a), and one count of kidnapping a government employee, under

§ 1201(a)(5).  He pled guilty to all three charges.  As relevant here, the parties disputed two enhancements at sentencing: one, for using a dangerous weapon during a kidnapping and a robbery, U.S.S.G. §§ 2A4.1(b)(3), 2B3.1(b)(2)(D), and the other, for kidnapping a government employee, *id.* § 3A1.2(a)(1)(A), (a)(2).  Agreeing with the government, the sentencing judge imposed both enhancements.  Those rulings resulted in a final offense level of 37 and a guidelines range of 262 to 327 months.  The judge sentenced Chandler to the bottom of that range: 262 months' imprisonment, with 5 years of supervised release.

Chandler now appeals the application of those two enhancements, arguing that the judge erred in holding that a replica of a gun constitutes a dangerous weapon, and further erred in holding that his kidnapping of the second mail carrier was motivated by her status as a government employee.  He also appeals his conviction for armed robbery, rather than unarmed robbery, again arguing that a replica firearm is not a dangerous weapon.[1]

---

[1] Chandler appeals his sentence, despite pleading guilty to the offenses without a plea agreement, as he preserved his appellate rights regarding "rais[ing] an objection that [the District Court] varied upward from the sentencing guidelines improperly or departed upwards from the sentencing guidelines improperly[.]"  (J.A. at 29.)  He also appeals his armed robbery conviction, arguing that the District Court erred by accepting his guilty plea to armed robbery because he only used a replica firearm.  *See infra* Section II.B.

II.   **DISCUSSION**[2]

A.   **Under the Guidelines, a Replica Firearm Is a "Dangerous Weapon"**[3]

The sentencing guidelines provide for enhanced sentences for both kidnapping and robbery if "a dangerous weapon" was used. *Id.* §§ 2A4.1(b)(3) (kidnapping); 2B3.1(b)(2)(D) (robbery). Chandler contests the dangerous-weapon enhancements to both his robbery and kidnapping charges, given that he did not use a real gun. "The government bears the burden of proving by a preponderance of the evidence that" the enhancements are applicable. *United States v. Napolitan*, 762 F.3d 297, 309 (3d Cir. 2014).

The relevant guidelines sections do not define "dangerous weapon," but the guidelines' commentary defines the term to include, besides "an instrument capable of inflicting death or serious bodily injury,"

> an object that is not an instrument capable of inflicting death or serious bodily injury but [] closely resembles such an instrument; or [something] the defendant used … in a manner

---

[2] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

[3] We review the District Court's interpretation of the guidelines de novo. *United States v. Grier*, 475 F.3d 556, 570 (3d Cir. 2007) (en banc).

that created the impression that the object was such an instrument (*e.g.*, a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun).

U.S.S.G. § 1B1.1 cmt. n.1(E).

That comment informed our jurisprudence for more than 30 years, but reliance on it has recently become questionable.[4]  The Supreme Court held in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), that courts must perform a "now-essential" textual analysis before turning to the commentary.  *See United States v. Adair*, 38 F.4th 341, 349-50 (3d Cir. 2022) (citing *Kisor*, 139 S. Ct. at 2415-18).  Unless the guideline's text is ambiguous and the comment provides clarity, the text alone controls.  *United States v. Nasir*, 17 F.4th 459, 471 (3d Cir. 2021) (en banc).

Ambiguity is thus the key to permissible reliance on the guideline's commentary.  The Supreme Court has instructed that a regulation is "genuinely ambiguous … after a court has resorted to all the standard tools of interpretation" and come up

---

[4] Prior to 2022, we uniformly held that the use of fake or simulated firearms in furtherance of crimes like robbery qualified as use of a "dangerous weapon" subject to sentencing enhancement under the guidelines.  *See, e.g.*, *United States v. Bell*, 947 F.3d 49, 62 (3d Cir. 2020) (toy gun); *United States v. Hoffa*, 587 F.3d 610, 615-16 (3d Cir. 2009) (hand in a pocket); *United States v. Orr*, 312 F.3d 141, 143-44 (3d Cir. 2002) (dismantled pellet gun); *United States v. Dixon*, 982 F.2d 116, 121-24 (3d Cir. 1992) (hand in a towel).

short.  *Kisor*, 139 S. Ct. at 2414.  "[O]nly when that legal toolkit is empty and the interpretive question still has no single right answer can a judge … wave the ambiguity flag[.] … To make that effort, a court must carefully consider the text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on."  *Id.* at 2415 (cleaned up).

Even if genuine ambiguity does exist, we still will not defer to the agency's reading unless it is reasonable.  *Id.*  The commentary must clarify the ambiguity rather than change the meaning of the text.  *Kisor*, 139 S. Ct. at 2415-16.  If the commentary is reasonable, we afford it controlling deference; but only if the agency's interpretation: (1) was "one actually made by the agency"; (2) "implicate[s the agency's] substantive expertise"; and (3) "reflect[s] fair and considered judgment."  *Id.* at 2416-17 (internal quotation marks omitted).

Chandler says that the term "dangerous weapon" is not genuinely ambiguous so we cannot rely on the commentary.  Alternatively, he argues that, even if the term is ambiguous, the commentary is an unreasonable interpretation of the guideline.

We are unpersuaded by his arguments for two reasons.  First, the term "dangerous weapon" is indeed genuinely ambiguous, being subject to a range of views, so we can rely on the Sentencing Commission's commentary to reasonably interpret the phrase to include replica firearms.  Second, the meaning of the words "dangerous weapon," as understood from Supreme Court precedent at the time the pertinent guideline, § 1B1.1, was promulgated, encompassed replica firearms, thus making the commentary reasonable and entitled

to controlling weight.  We address each of those points more fully in turn.

### 1.  *The Phrase "Dangerous Weapon" Is Genuinely Ambiguous*

Federal courts have grappled for many years with the scope of the term "dangerous weapon" in sentencing decisions.[5]  This debate continued with the recent split decision of the Sixth Circuit in *United States v. Tate*, a case involving a bank robber who placed his hand in a shoulder bag in a manner that led the teller to believe that the robber was about to pull out a gun.  999 F.3d 374, 376 (6th Cir. 2021).  A majority of

---

[5] *Compare United States v. Mahler*, 891 F.2d 75, 77 (4th Cir. 1989) (holding that a displayed replica handgun used in a bank robbery was not covered by the dangerous-weapon enhancement), *with United States v. Shores*, 966 F.2d 1383, 1388 (11th Cir. 1992) (holding the opposite for merely possessing – never brandishing – a toy gun in an attempted bank robbery), *and Hoffa*, 587 F.3d at 616 (applying the enhancement to a bank robber who placed his hand in his pocket to create the appearance of a firearm); *United States v. Sturgis*, 48 F.3d 784, 786-89 (4th Cir. 1995) (recognizing that a bite from an HIV-positive prisoner could be an assault with a "dangerous weapon"), *with United States v. Taylor*, 961 F.3d 68, 75 (2d Cir. 2020) (refusing to apply the enhancement to a robber who placed his hand on his waistline to suggest a firearm), *and United States v. Rocha*, 598 F.3d 1144, 1157 (9th Cir. 2010) (holding that defendant did not use a dangerous weapon when he used his bare hands to pull someone's feet out from under them, slamming them onto a concrete floor).

the panel affirmed the application of the dangerous-weapon sentencing enhancement but one judge saw the matter differently and concluded that "[n]o ordinary English speaker … would say that a robber *possesses* a dangerous weapon when the robber merely *pretends* to possess one." *Id.* at 386 (Murphy, J., concurring) (emphasis in original).  The majority held, however, that "literal or dictionary definitions of words will often fail to account for settled nuances or background conventions that qualify the literal meaning … of legal language." *Id.* at 378 (majority opinion) (internal quotation marks omitted).  In the majority's view, "creating the impression of possessing a gun can trigger the sentencing enhancement applicable to robberies." *Id.* at 381.

Our dissenting colleague in this case, like the concurring judge in *Tate*, defines "dangerous weapon" as "one by the use of which a fatal wound may probably or possibly be given." Dissent at 2 (quoting *Dangerous Weapon*, *Black's Law Dictionary* (5th ed. 1979); and citing *Dangerous Weapon* (def. 1), *Ballentine's Law Dictionary* (3d ed. 1969), and *Weapon* (def. 1), *Webster's Third New International Dictionary* (1966)).  This ends the debate for him.  And that definition of course fits the words, but it is not the only meaning.  Both the *Black's* and *Ballentine's* definitions encompass a broader definition of the words "dangerous weapon" than the dissent suggests.

The *Black's* definition notes that "the manner of use enters into the consideration as well as other circumstances[.]" *Dangerous Weapon*, *Black's Law Dictionary* (5th ed. 1979).  Similarly, later, the sixth edition of the same dictionary says that "[w]hat constitutes a 'dangerous weapon' depends not on nature of the object itself but on its capacity, given manner of

its use, to endanger life or inflict great bodily harm." *Dangerous Weapon*, *Black's Law Dictionary* (6th ed. 1990); *see also Weapon, Black's Law Dictionary* (6th ed. 1990) ("An instrument of offensive or defensive combat, *or anything used*, or designed to be used, in destroying, defeating, *threatening,* or injuring a person." (emphases added)).  As words change meaning over time, not just when a new edition of *Black's Law Dictionary* is issued, a more contemporaneous edition, issued three years after the guideline[6] rather than nine years earlier, provides more persuasive evidence of how the guidelines' drafters used the word at the time the dangerous-weapon enhancement was adopted.  Thus, in 1987, manner of use, including the potential to create harm through threats, was most likely part of the understanding of how to define a "dangerous weapon."

More to the point, however, while providing guidance, dictionaries do not create precedent.  The Supreme Court does. As the majority in *Tate* observed, 999 F.3d at 378-79, the phrase "dangerous weapon" is a legal term of art that for decades has embraced a functional meaning as reflected in the Supreme Court's opinion in *McLaughlin v. United States*, 476 U.S. 16, 17 (1986).  This must be taken into account: "[W]e do not woodenly interpret a legal text 'in a vacuum,' but instead discern 'the meaning of a statement' in a law from the 'context in which it is made[.]'" *Tate*, 999 F.3d at 378 (internal citation omitted) (first quoting *Abramski v. United States*, 573 U.S. 169, 179 (2014); and then quoting *United States v. Briggs*, 141 S. Ct. 467, 470 (2020)).

---

[6] The dangerous-weapon enhancement was present in the first guidelines, promulgated on November 1, 1987.

One year before the dangerous-weapon enhancement appeared in the guidelines, the *McLaughlin* Court held that something that looks like an operable gun – there, an unloaded gun – qualifies as a "dangerous weapon" because it was characteristically dangerous, can instill fear in the average citizen, can be used as a bludgeon, and can invite a dangerous and violent response.[7] 476 U.S. at 17-18 (holding that each reason is "independently sufficient [to] support [that] conclusion"). Thus, the presence of even a replica of a gun raises the temperature during a crime. It increases the likelihood that a reasonable police response will include the use of deadly force, which may also create "greater risk to the physical security of victims, bystanders, and even the

---

[7] Our dissenting colleague focuses on the Supreme Court's footnote in *McLaughlin* citing congressional floor debate which "indicate[d] that Congress regarded incitement of fear as sufficient to characterize an apparently dangerous article … as 'dangerous[.]'" 476 U.S. at 18 n.3. He argues that legislative history is "irrelevant[,]" "cannot universally justify stretching the meaning of dangerous weapon[,]" and "no longer carries the weight that it once did." Dissent at 5. But we are not relying on legislative history. We are following precedent set by the Supreme Court, which held that the fear created by an unloaded gun is sufficient to qualify the weapon as dangerous. *Cf. Gilles v. Davis*, 427 F.3d 197, 210 (3d. Cir. 2005) (following the Supreme Court's counsel "to follow its directly applicable precedent, even if that precedent appears weakened by pronouncements in its subsequent decisions, and to leave to the Court the prerogative of overruling its own decisions." (internal quotation marks and citations omitted)).

perpetrators." *United States v. Dixon*, 982 F.2d 116, 123 (3d Cir. 1992) (internal quotation marks omitted). It also increases the risk of violent response by victims themselves, as well as bystanders. *Cf. Bruce v. Powell*, No. 19-cv-13028, 2021 WL 5565166, at *4 (D.N.J. Nov. 29, 2021) ("The victim's friend … reached for his gun first, which provoked [the defendant] to reach for his gun, which in turn caused the victim to reach for his gun."). When the guidelines enhancement was written, the Sentencing Commission was, we can be sure, fully aware of the Supreme Court's analysis in *McLaughlin* and its legal definition of "dangerous weapon."[8] We are not free to ignore

---

[8] It is also worth noting that both the 2014 and 2019 editions of *Black's Law Dictionary* do more than "hint" that "dangerous weapon" has a broader legal meaning: it directly excerpts *McLaughlin* in the definition of dangerous weapon itself. It defines "dangerous weapon" as:

> [a]n object or device that, because of the way it is used, is capable of causing serious bodily injury.

> "Three reasons, each independently sufficient, support the conclusion that an unloaded gun is a 'dangerous weapon.' First, a gun is an article that is typically and characteristically dangerous; the use for which it is manufactured and sold is a dangerous one, and the law reasonably may presume that such an article is always dangerous even though it may not be armed at a particular time or place. In addition, the display of a gun instills fear in the average citizen; as a consequence it creates an immediate danger that

the import of *McLaughlin* now.  We are asked to interpret the same term (in the same robbery context) that the Supreme Court defined in *McLaughlin*.  Despite our dissenting colleague's view, we decline to bypass instruction from the highest court of the land in favor of a fifty-year-old dictionary definition.  *McLaughlin* shapes our understanding of the meaning of "dangerous weapon," as it surely shaped the understanding of the term had by the guidelines' drafters.

The Sentencing Commission first defined "dangerous weapon" in the commentary as "an instrument capable of inflicting death or serious bodily injury."  U.S.S.G. § 1B1.1 cmt. n.1(d) (1987).[9]  Within a couple of years, for the

---

a violent response will ensue.  Finally, a gun can cause harm when used as a bludgeon."  *McLaughlin v. U.S.*, 476 U.S. 16, 17-18 [] (1986).

*Weapon*, *Black's Law Dictionary* (11th ed. 2019); *Weapon*, *Black's Law Dictionary* (10th ed. 2014).  Thus, it seems plain to us that the term "dangerous weapon" encompasses two different definitions of dangerous weapon: one of an instrument inherently dangerous and one of an instrument or article perceived as dangerous or that could cause danger, while not dangerous per se.

[9]  Our dissenting colleague suggests that the Commission rejected *McLaughlin* the year after its issuance.  However, for support he cites to informal agency guidance that discusses "toy guns" (not replicas) and expressly disclaims that it "does not necessarily represent the official position of the Commission, should not be considered definitive, and is not

"purpose[] of … *clarify[ing] the definition* of a dangerous weapon[,]" the Commission amended the commentary to say, "[w]here an object that appeared to be a dangerous weapon was brandished, displayed, or possessed, treat the object as a dangerous weapon[.]" *Id.* app. C, amend. 71 (1989) (emphasis added). That 1989 amendment, and later amendments, were added to be "in accord[,]" *id.* app. C, amend. 601 (2003), with decisions like ours in *United States v. Dixon*, where we applied the dangerous-weapon enhancement to a bank robber who wrapped a towel over her hand and pointed menacingly at bank employees. 982 F.2d at 119; *see also United States v. Davis*, 635 F.3d 1222, 1225 (D.C. Cir. 2011) ("[T]he current version of the Commentary [regarding the dangerous-weapon enhancement] all but codifies the holding in *United States v. Dixon*[.]").

Our decision in *Dixon* relied heavily on *McLaughlin* to hold that the Commission intended to "equate[] the image of a 'dangerous weapon' with its reality for purposes of sentence enhancement." *Dixon*, 982 F.2d at 121. And rightly so; this equation allows the guideline to conform to the reality of the dangers created by things that appear to be guns. The Commission's 1989 Amendment can thus be seen as

---

binding upon the Commission, [or] the court[.]" *U.S. Sentencing Commission Answers Questions Most Frequently Asked About the Sentencing Guidelines*, 1 Fed. Sent'g Rep. 423, 423, 425-26 (1989). Additionally, the Commission amended the commentary just six months after that guidance to encompass items such as replica or toy guns, in accord with *McLaughlin*. U.S.S.G. app. C, amend. 71 (1989) (amended November 1, 1989).

purposefully clarifying the definition of "dangerous weapon" rather than expanding it.[10] *Cf. Kisor*, 139 S. Ct. at 2412 (the presumption that the promulgating agency "is in the better position [to] reconstruct its original meaning" "holds good for a significant category of contemporaneous readings. Want to know what a rule means? Ask its author.") (internal quotation marks and citation omitted); U.S.S.G. app. C, amend. 71 (1989) (promulgated two years after the guideline).

Notably, every time we have analyzed this issue after the 1989 Amendment we have held that instruments used during the commission of a crime to give the appearance or prompt the perception of a bona fide dangerous weapon were

---

[10] Our dissenting colleague seems wary of the commentary to the Amendment stating that it merely "clarifies" the Guideline. Dissent at 4; U.S.S.G. § 1B1.1 app. C, amend. 71 (1989). We think, however, that it is appropriate to take the commentary's assertion of the Amendment's purpose at face value because the Amendment indeed seems to be just a clarification. While we have rejected application of a later guideline's commentary to earlier guidelines based on ex post facto challenges, *see United States v. Menon*, 24 F.3d 550, 567 (3d Cir. 1994), that is not at issue here. Rather, outside of that context, we have said, "[W]hen an amendment to a guideline is *intended to clarify* the meaning of the existing guideline, the court [should] give it substantial weight in interpreting that guideline." *Id.* at 567 (citations omitted and emphasis added).

properly a basis for a "dangerous-weapon" enhancement.[11] *See, e.g.*, *supra* n.4. The only cases Chandler cites for support of his position were decided before the 1989 Amendment, and still support application of the enhancement. *United States v. Dzielinski*, 914 F.2d 98, 102 (7th Cir. 1990) (affirming the district court's application of the enhancement pre-1989 Amendment because it "relied upon the failure of the [g]uidelines to adequately consider the threat posed by the possession of what appeared to be a dangerous weapon"); *United States v. Mahler*, 891 F.2d 75, 77 (4th Cir. 1989) (similarly affirming the district court's "plainly reasonable" action of "treating the replica of a gun as an empty gun for the purpose of increasing the sentencing level" pre-Amendment). Chandler does not point to any post-1989 cases that have maintained his position, and we could not find any.[12]

---

[11] Three cases decided this past year also came out the same way. *See generally United States v. Jefferson*, No. 22-1306, 2023 WL 2378510 (6th Cir. Mar. 7, 2023) (passing a note while robbing a bank indicating that he had a gun and, during one of the robberies, miming having a gun by putting his hand in his pocket and making a gun-like hand motion); *United States v. Wen*, No. 22-50207, 2023 WL 3495820 (9th Cir. May 17, 2023) (possession of car, hammer, box cutter, and rope in connection with offense constituted dangerous weapons); *United States v. Padilla*, 651 F. Supp. 3d 1261 (D.N.M. 2023) (lifting his shirt to show cashier an object that looked like a gun).

[12] *Taylor*, 961 F.3d at 75, decided a few years ago, is the closest thing to support for Chandler's position. The Second Circuit held that a robber merely placing his hand "*near* his

So, while nothing in the structure of § 1B1.1 of the guidelines sheds light on the meaning of "dangerous weapon," the text, history, and purpose of the guideline suggest that the term does not have just one, narrow meaning. That does not, however, remove all question of the scope of the term, though it helps. Because the term "dangerous weapon" retains arguable ambiguity even after a consideration of "the text, structure, history, and purpose of [the] regulation," *Kisor*, 139 S. Ct. at 2415, we now turn to the Commission's commentary and ask whether it is "reasonable" and "entitle[d] … to controlling weight[,]" *id.* at 2415-16.

2.  *The Commentary Definition is Reasonable and Entitled to Controlling Weight and, Thus, Deference*

The Commission's commentary is a reasonable reading of the guideline's text, falling within "the outer bounds of permissible interpretation." *Id.* at 2416. As examined above, the text of § 1B1.1 is ambiguous because the term "dangerous weapon" can be read literally to focus on inherently dangerous weapons, such as firearms, and it can also be read to encompass objects or actions that simulate an inherently dangerous

---

waistband, not inside it[,]" to suggest he had a firearm did not constitute a "dangerous weapon" for enhancement purposes. *Id.* But the court's analysis strongly emphasized the fact that the robber's hand was "unconcealed" and could therefore "not appear to be itself a weapon." *Id.* And the court drew a contrast with caselaw that uniformly held that a "concealed" hand could "itself appear[] to be a dangerous weapon." *Id.* at 76.

weapon and thereby create dangerous conditions or reactions. The commentary's gloss defines "dangerous weapon" to include both of those plausible meanings, thus following *McLaughlin* and being well within the bounds of reasonable interpretation of "dangerous weapon" as a legal term of art, not a mere "fiction[,]" as the dissent suggests.  U.S.S.G. § 1B1.1 cmt. n.1(E) (2021); *id.* app. C, amend. 71 (1989); Dissent at 5.

Moreover, under the longstanding prior-construction canon,[13] when "judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its … judicial interpretations as well." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) (rejecting a narrow interpretation of a statutory term when the Supreme Court had previously adopted a broad construction of the same term used in a different statute).[14]

---

[13] *See Shapiro v. United States*, 335 U.S. 1, 16 (1948) (Vinson, C.J.) ("In adopting the language used in the earlier act, Congress 'must be considered to have adopted also the construction given by this Court to such language, and made it a part of the enactment.'" (quoting *Hecht v. Malley*, 265 U.S. 144, 153 (1924)).

[14] *See also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 324-25 (2012) (when the Supreme Court authoritatively interprets a term as it is used in a particular field of law, that term acquires a "technical legal sense … that should be given effect in the construction of later-enacted" laws and rules governing that field, even when based on a single decision).

That canon applies when interpreting the guidelines as well. The Sentencing Commission is "a body that straddles both the legislative and judicial branches of the government," *Nasir*, 17 F.4th at 470, and is steeped in sentencing policy and criminal law jurisprudence, *cf. United States v. Mercado*, 81 F.4th 352, 360 (3d Cir. 2023) (finding the Sentencing Commission "optimally positioned to opine" on criminal sentencing due to its "expertise").[15]   It could "hardly have been unaware[,]" *Merrill Lynch*, 547 U.S. at 85, of the landmark *McLaughlin* decision when it employed the phrase "dangerous weapon" in the guidelines.   With that understanding, and because the application note's interpretation is consistent with the text, history, and purpose of § 1B1.1, we conclude that the Commission's definition is reasonable and reflects its "fair and considered judgment."   *Kisor*, 139 S. Ct. at 2417.   The definition of "dangerous weapon" in § 1B1.1's commentary should therefore be afforded deference.   *See id.* at 2415-18 (citing generally *Auer v. Robbins*, 519 U.S. 452 (1997)).

### 3.    *Lenity Cannot Save Chandler's Position*

Chandler and our dissenting colleague also contend that the rule of lenity should resolve any ambiguity in Chandler's favor.   Chandler's argument relies on the assumption that his replica firearm was not dangerous because it could not be used as a bludgeon, a possibility noted in *McLaughlin*.   This, of course, ignores the force of the arguments just outlined concerning the other threats created by a plausible facsimile of

---

[15]   Due to the commentary falling within the Commission's "substantive expertise[,]" we can give it controlling weight.   *Kisor*, 139 S. Ct. at 2417.

a gun, including the increased risk that a violent response will be triggered and the fear instilled in victims, both of which were present here and which *McLaughlin* emphasized are "each independently sufficient." 476 U.S. at 17. But, even taking Chandler's argument on its own terms, it comes up short. The record does not support the assumption that his replica revolver could not be a bludgeon.[16] The record shows only that he admitted that he "placed … [a] replica handgun" on the back of a mail carrier and that, when he was arrested, the police found the revolver in his waistband and later confirmed it to be a replica. (J.A. at 30.) A replica is "a copy exact in all details," *Replica*, *Merriam-Webster's Collegiate Dictionary* (10th ed. 2002), or a "reasonably exact duplicate[,]" *Replica*, *Black's Law Dictionary* (11th ed. 2019). That certainly implies a close similarity in heft. Thus, the fake gun could have been used in a pistol whipping, which, all by itself, makes his replica a dangerous weapon.

As noted earlier, the government must prove enhancements by a preponderance of the evidence. *Napolitan*, 762 F.3d at 309. While there is, as we have discussed, legal ambiguity in the phrase "dangerous weapon," there is no such ambiguity in Chandler's conduct. It clearly falls within the scope of the relevant application note, U.S.S.G. § 1B1.1 cmt. n.1(E), which we have concluded can properly be considered. *See generally Nasir*, 17 F.4th at 471.

---

[16] The District Court adopted the facts from the presentence report at sentencing, including Chandler's use of a replica firearm during his crimes. Neither the District Court, nor any of the parties, discussed or placed any evidence in the record as to the weight of the replica firearm.

Our dissenting colleague disagrees, and argues that when a guideline is ambiguous, before deferring to the Sentencing Commission's commentary, we must first apply the rule of lenity. We disagree.

Again, *Kisor* instructs courts to "exhaust all the 'traditional tools' of construction[,]" including "the text, structure, history, and purpose of a regulation[.]" 139 S. Ct. at 2415. Those interpretative tools do not typically imply resort to judicial doctrines. *See, e.g.*, *Shular v. United States*, 589 U.S. 154, 166-67 (2020) (Kavanaugh, J., concurring) ("[W]hen 'a reviewing court employs all of the traditional tools of construction, the court will almost always reach a conclusion about the best interpretation,' thereby resolving any perceived ambiguity. That explains why the rule of lenity rarely comes into play." (quoting *Kisor*, 139 S. Ct. at 2448 (Kavanaugh, J., concurring in judgment))). If they did, the rule of lenity – itself a judicial doctrine – would seem to trump the traditional tools of interpretation any time ambiguity arises, which would render the tools irrelevant.

Moreover, the next analytical step called for by *Kisor* when a regulation is found to be genuinely ambiguous is an inquiry into the agency's interpretation of the regulation, not an application of separate judicial doctrines. *See* 139 S.Ct. at 2416. Similarly, nowhere in the *Nasir* majority opinion – which constitutes our application of *Kisor* to the guidelines – do we mention the rule of lenity.[17] 17 F.4th at 471-72 (discussing and applying *Kisor*).

_____

[17] Although we noted that the rule of lenity might have a role to play in the *United States v. Nasir* concurrence, 17

21

Nor does application of the rule of lenity make sense here. First, "the rule of lenity only applies if, after seizing *everything* from which it can be derived, we can make no more than a guess as to what Congress intended." *United States v. $734,578.82 in U.S. Currency*, 286 F.3d 641, 658 (3d Cir. 2002) (emphasis added) (quoting *Muscarello v. United States*, 524 U.S. 125, 138 (1998)). Here, we can look to the commentary, which clarifies what is otherwise ambiguous, obviating the need to consider the rule of lenity. If lenity principles applied whenever the sentencing guidelines are held to be ambiguous, then like the other *Kisor* interpretative tools, commentary issued by the sentencing commission would be made superfluous.[18] That surely could not have been

---

F.4th at 472-74 (Bibas, J., concurring), that view was not adopted by the majority, and is not a binding command to let lenity displace the Sentencing Commission's guidance.

[18] Our dissenting colleague says that the rule of lenity only displaces commentary that is not favorable to the defendant. That assumes two things that we do not.

First, it assumes guidelines commentary can properly be broader or harsher than the guidelines themselves. It cannot. As discussed above and in *Nasir*, *cf.* 17 F.4th at 469, we do not defer to commentary if it expands the guideline at issue. Here, the commentary "purposefully clarif[ies] the definition of 'dangerous weapon' rather than expanding it." *Supra* at page 12. Thus, deference is appropriate, and the rule of lenity has no role.

Second, accepting arguendo that the commentary differs from the guidelines, our colleague's position also assumes that all judges see alike on whether commentary is

Congress' intent.[19]  Nor ours in *Nasir*.  The Commission's writing of the commentary, and our examination of it as needed, is not designed as an exercise in futility.

The District Court correctly applied the dangerous-weapon enhancement to Chandler because of his use of a replica firearm.

---

"neutral or defendant friendly[.]"  Dissent at 7 (cleaned up). That is not so, as is evident here, since we see the commentary as explaining, not expanding, the scope of the guideline.

Our colleague also states that "lenity ... must come before deference" as a "traditional canon[] of statutory construction[.]"   Dissent at 7 (internal quotation marks omitted).  That undermines his statement that the rule of lenity would only displace commentary which is unfriendly to the defendant.  Were we to apply the rule of lenity first, we would never have occasion to defer to commentary, as we would have already decided to apply the most defendant-friendly reading of the guideline, regardless of what the commentary had to say.

[19] *Cf. United States v. Cooper*, 396 F.3d 308, 312 (3d Cir. 2005), *as amended* (Feb. 15, 2005) ("It is a well known canon of statutory construction that courts should construe statutory language to avoid interpretations that would render any phrase superfluous." (citing *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)).

**B.     The District Court Did Not Err in Accepting Chandler's Guilty Plea**

For the first time on appeal, Chandler argues that the District Court erred by accepting his guilty plea to armed robbery.[20]  Because he only used a replica firearm, he claims he was effectively unarmed.  Armed robbery, versus unarmed robbery, increases the maximum sentence from ten years to twenty-five years.  18 U.S.C. § 2114(a).  For the same reasons that the District Court did not err in applying the dangerous-weapon enhancement, we conclude that the Court did not commit plain error in accepting the armed robbery guilty plea.  Chandler was indeed armed with a dangerous weapon when he robbed the mail carriers.

---

[20] We review unpreserved claims for plain error, which is more deferential than de novo or clear error review.  Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 731-32 (1993).  "There must be an 'error' that is 'plain' and that 'affect[s] substantial rights.' … Rule 52(b) leaves the decision to correct the forfeited error within [our] sound discretion … and [we] should not exercise that discretion unless the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Olano*, 507 U.S. at 732 (first and last alterations in original).

**C.   The District Court Properly Enhanced Chandler's Sentence for Kidnapping a Government Employee in the Course of Her Duties**[21]

The District Court enhanced Chandler's kidnapping sentence under U.S.S.G. § 3A1.2(a) and (b).   That enhancement applies if the victim was a "government officer or employee," and "the offense of conviction was motivated by such status[.]" *Id.*  The Court found that Chandler's motivation to kidnap the mail carrier was based in part on her status as a government employee.   The parties agree that she was a government employee; therefore, the only question is whether the kidnapping was "motivated by such status."  *Id.* § 3A1.2(a)(2).

"Motive is a question of fact[,]" *Monteiro v. City of Elizabeth*, 436 F.3d 397, 405 (3d Cir. 2006), and we review the District Court's factual findings for clear error.  *United States v. Richards*, 674 F.3d 215, 220 (3d Cir. 2012).  The record with respect to the District Court's finding on Chandler's motive is

---

[21] We review the District Court's interpretation of the sentencing guidelines de novo, *United States v. Adair*, 38 F.4th 341, 347 (3d Cir. 2022), but we accept its findings of fact "unless they are clearly erroneous and … give due deference to the [D]istrict [C]ourt's application of the guidelines to the facts[,]" 18 U.S.C. § 3742(e); *United States v. Richards*, 674 F.3d 215, 218, 219 n.2 (3d Cir. 2012); *see also United States v. Napier*, 273 F.3d 276, 278 (3d Cir. 2001) (for sentencing guidelines decisions, "[f]actual findings … are simply reviewed for clear error").

admittedly scant. The Court stated only that "[the] postal workers … had their uniforms on and Mr. Chandler knew exactly what he was doing." (J.A. at 43-44.) But while the judge did not give comprehensive remarks, he was not silent either, and we do not require perfect explanations from sentencing judges. *Cf. DiFederico v. Rolm Co.*, 201 F.3d 200, 208 (3d Cir. 2000) ("[I]t is [our] responsibility … to accept the ultimate factual determination of the [District Court] unless that determination either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data." (internal quotation marks omitted)).

A defendant may be said to be motivated by a victim's status as a government employee when that status has "influenc[ed] [the defendant's] choice" to commit the crime. *Motivate* (def. 1) & *Motive* (def. 1b), *Webster's Third New International Dictionary* (1986); *see also Motive*, *Black's Law Dictionary* (11th ed. 2019) ("Something, esp[ecially] willful desire, that leads one to act."). Chandler argues that knowledge alone cannot trigger this enhancement. We agree.[22] *See United States v. Sulik*, 929 F.3d 335, 337-38 (6th Cir. 2019). Instead, a victim's status as a government employee must have been at least part of the reason why the defendant committed the crime. *Cf. Hassan v. City of New York*, 804 F.3d 277, 297 (3d Cir. 2015) ("Motive asks … why did he do it?") (cleaned up). That status need not, however, be the only reason for the

---

[22] Some degree of knowledge must be present, however. Section 3A1.2(a) implicitly includes a knowledge requirement because, as common sense dictates, to be motivated by a victim's status, the defendant must know it.

crime; multiple motives can coexist.  *See Motivate* (def. 1), *Webster's Third New International Dictionary* (1986) (giving examples of "factors that [motivate] people"); *United States v. Feeback*, 53 F.4th 1132, 1135 (8th Cir. 2022) (applying the "official victim" enhancement when a defendant made illegal threats to Veterans Affairs employees regarding his benefits because "[i]t ma[de] no difference that money may have [also] played a role").

The record here amply supports that the robberies were motivated by the victims' status as postal workers.  Chandler donned a sweatshirt emblazoned with "USPS," short for United States Postal Service, and robbed the two USPS employees, in the same area, separated by just a few weeks.[23] The question is whether that motivation can be imputed to the kidnapping of his second victim.[24]

---

[23] Chandler asserts that his sole motivation for the robberies was "to obtain packages from a delivery person, regardless of employment status" (Opening Br. at 14, 20), not "to steal packages carried by the Postal Service." (Answering Br. at 12).  He insists that his motivation was purely economic and that had he "taken packages from a UPS, FedEx, or Amazon driver, his motive would have been the same." (Reply Br. at 6.)  But Chandler did not rob a private package delivery contractor.  He robbed two USPS workers while wearing a USPS sweatshirt.  There is no evidence in the record that he robbed or attempted to rob any other package delivery workers.

[24] For purposes of analysis, we look only to the second robbery, which occurred contemporaneously with the kidnapping of the mail carrier.  The government urges us to

The Guideline's enhancement states that the "offense of conviction" must have been motivated by the government employee status. U.S.S.G. § 3A1.2(a). The government asks us to read "offense of conviction" broadly and to consider all relevant conduct regarding both the robberies and the kidnapping. [25] Chandler says we should focus on the language of the indictment pertaining to the kidnapping count and its elements, and not "mix and match" counts to apply the enhancement. (Opening Br. at 19.) He relies on *United States v. Boney*, but that case addresses the choosing of an applicable guideline. 769 F.3d 153, 161 (3d Cir. 2014). It does not stand for the proposition that a court cannot consider all related conduct when deciding whether to apply an enhancement. *Id.*

While the "'offense of conviction' includes only the substantive crime for which a particular defendant was convicted" and "the facts undergirding" it, *United States v. Pressler*, 256 F.3d 144, 157-58 n.7 (3d Cir. 2001), our decision in *United States v. Murillo* makes clear that the "conduct of the

---

consider Chandler's first armed mail theft, which occurred a month prior, as "relevant conduct" to determine his motive for kidnapping the mailwoman. (Answering Br. at 16 ("[T]he [D]istrict [C]ourt's factual determinations may be based on the record in its entirety[.]").) We need not consider that earlier incident because the circumstances of the second robbery are sufficient to demonstrate his motivation for the kidnapping.

[25] The enhancement was not added to the robbery convictions since the robbery-of-a-postal-employee statute already takes the victim's status into account. 18 U.S.C. § 2114(a) (robbing a postal service worker).

offense of conviction" includes "all conduct in furtherance of the offense of conviction[,]" 933 F.2d 195, 199 (3d Cir. 1991). Though *Murillo* addressed sentencing enhancements for a defendant's role in the offense, its reasoning applies equally to the question of motive. Often, "a court simply cannot determine [motive] by looking at only the specific elements of the offense of conviction. [Motive] is a concept that requires a court to consult the events leading up to the offense of conviction, not just a snapshot of events at the instant the offense occurred." *Id*. at 200. So, while we focus on the motive for the kidnapping, we also consider the robbery that immediately preceded and prompted it. The two "were inextricably intertwined[.]" (Answering Br. at 18.) But for the robbery, there is no reason to believe that the kidnapping would have occurred at all.

Chandler also invokes *United States v. Cherry*, where we held that a court cannot "look through" the enhanced conviction to an underlying offense to find an official victim. 10 F.3d 1003, 1011 (3d Cir. 1993) (rejecting applying the enhancement based on a flight from prosecution offense, which lacks an official victim, or any victim at all). That, however, says nothing about our case, in which the District Court looked at the facts attendant to the kidnapping to determine Chandler's motive for the crime. That was appropriate, since motive can almost never be discerned without examining circumstantial evidence. *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016) ("Because motivation is almost never subject to proof by direct evidence, [one] must rely on circumstantial evidence to prove … motive.").

The District Court thus properly applied the official victim enhancement to the kidnapping offense. The Court

stressed that Chandler had chosen to target a mail carrier in uniform. And it adopted the Presentence Report's finding that the mailwoman's government-employee status had motivated his kidnapping. *Cf. United States v. Collado*, 975 F.2d 985, 990 (3d Cir. 1992) (when "the district court makes no independent findings of fact in relation to sentencing issues, but instead adopts the reasons set forth by the probation officer in the presentence investigation report, we view the report as containing the only findings of fact that support the court's sentencing decision"). That is a sufficient basis for us to discern the Court's finding of fact, although it would of course be helpful for district courts to be more explicit.

Chandler robbed the mail carrier to steal USPS packages from her, and he kidnapped her to get away with those packages. The two crimes were tightly linked. By aiding Chandler's escape, the kidnapping served to facilitate the robbery itself, and the motivations for the two crimes cannot be unwound.

Most of our sister courts have read this enhancement the same way: it applies when a defendant not only knew the victim was a government employee but the motivation for the criminal action also arose from the duties of the government employee victim, as here.[26] Absent the mail carrier's status as

---

[26] *United States v. Feeback*, 53 F.4th 1132, 1134-35 (8th Cir. 2022) (official victim enhancement applied to defendant who made violent threats against Veterans Affairs employees over the non-payment of benefits he thought owed to him); *United States v. Ball*, 18 F.4th 445, 457 (4th Cir. 2021) (same for defendant who fatally shot a police officer after his texts to

a postal service employee, she (and, thus, Chandler) would have lacked access to the USPS mailvan and the packages inside of it.  The guideline provision is "designed to protect government officers in the performance of their official

---

his girlfriend indicated that he would "kill any police officer attempting to take him into custody"); *United States v. Dávila-Bonilla*, 968 F.3d 1, 10-11 (1st Cir. 2020) (same for defendant who illegally intimidated and threatened his probation officer after being asked to take a random drug test); *United States v. Sulik*, 929 F.3d 335, 336-38 (6th Cir. 2019) (same for defendant who sent threatening emails to a member of Congress because he was upset with the content of the Representative's statements); *United States v. Watts*, 798 F.3d 650, 655 (7th Cir. 2015) (same for defendant who, after losing his excessive force civil rights case against a police officer, threw a forty-four pound chair at the defendant immediately after the verdict was read; the police officer "aroused the defendant's wrath by the exercise of police authority over him"); *United States v. Polk*, 118 F.3d 286, 297-98 (5th Cir. 1997) (same for defendant who was convicted of plotting to blow up an Internal Revenue Service building because, even though no one was killed and the defendant did not know the names of his intended victims, the defendant intended to "kill, injure, or maim federal employees in the [building] solely because those persons worked for the IRS"); *United States v. Rue*, 988 F.2d 94, 95, 97 (10th Cir. 1993) (same for prisoner who attacked a prison guard attempting to take away his "homemade hypodermic syringe"); *United States v. Sanchez*, 914 F.2d 1355, 1362-63 (9th Cir. 1990) (same for a defendant who rammed a border patrol agent with his car and physically assaulted the agent after later being confronted).

duties[,]" *United States v. Watts*, 798 F.3d 650, 655 (7th Cir. 2015), and this is such a scenario. Thus, the court did not clearly err in finding motive based on the status of the USPS worker whom Chandler robbed and kidnapped.

## III.  CONCLUSION

Criminal defendants have long been on notice that using an imitation of a dangerous weapon to achieve criminal ends is the equivalent in the eyes of the law of using the real thing. The fear instilled in victims is just as real and there remains a real risk of violence. The District Court did not err either in treating Chandler's replica handgun as a dangerous weapon or in accepting his guilty plea to armed postal robbery. Nor did the Court err when it found that Chandler was motivated to kidnap the mail carrier because she was a government employee. We will therefore affirm the District Court's judgment in all respects.

*United States v. Chandler*, No. 22-1786

BIBAS, *Circuit Judge*, dissenting.

A dangerous weapon must be both dangerous and a weapon. Fake guns are neither. Today, the majority holds otherwise.

James Chandler used a fake gun to kidnap and rob mail carriers. At sentencing, the District Court enhanced his sentence twice for (1) using a "dangerous weapon" and (2) targeting a government employee.

To affirm the first enhancement, my colleagues water down the ordinary meaning of "dangerous weapon" by including non-weapons that only seem dangerous. Yet text, history, and precedent are to the contrary. And even if the phrase were ambiguous, we should turn not to the Guidelines commentary but to the rule of lenity.

To affirm the second one, my colleagues supply what the District Court should have said. True, the District Court found that Chandler knew the mailwoman was a government employee. But it did not make the necessary link: that he had robbed and kidnapped her *because* she worked for the government. So I respectfully dissent on both sentencing issues.

I.   UNDER THE GUIDELINES, A FAKE GUN IS NOT A "DANGEROUS WEAPON"

A. The enhancement's text requires a weapon that can physically harm someone

We should start and end with the text. Both the kidnapping and robbery Guidelines enhance sentences "[i]f a dangerous

weapon was used." U.S.S.G. § 2A4.1(b)(3) (kidnapping); *accord* § 2B3.1(b)(2)(D) (robbery). Yet neither those Guidelines nor any others define "dangerous weapon," so we must dig into the phrase's ordinary meaning.

A "weapon" is "something (as a club, sword, gun, or grenade) used in destroying, defeating, or physically injuring an enemy." *Weapon* (def. 1), *Webster's Third New International Dictionary* (1966). And a "dangerous weapon" must be "dangerous to life; one by the use of which a fatal wound may probably or possibly be given." *Dangerous Weapon*, *Black's Law Dictionary* (5th ed. 1979); *accord Dangerous Weapon* (def. 1), *Ballentine's Law Dictionary* (3d ed. 1969) ("An instrument which, when used in the ordinary manner contemplated by its design and construction, will, or is likely to, cause death or great bodily harm."). So a dangerous weapon must, at a minimum, be able to kill or gravely harm another person.

That clear definition should resolve this case. Yet my colleagues do not mention it until several pages into their discussion. There, they admit "that definition of course fits." Maj. Op. 9. And later, they concede that mine is the "literal[ ]" "read[ing]." *Id.* at 17. But they call the plain meaning "narrow" and claim that "it is not the only meaning" of the term. *Id.* at 9, 17. So what does "dangerous weapon" mean? My colleagues never quite say. Nor do they offer examples of ordinary English usage that broaden "dangerous" to "apparently dangerous."

Instead, they suggest that the phrase has a broader meaning as a "legal term of art." *Id.* at 10. But their evidence does not support that bold claim. The post-1989 cases that they cite

reflexively deferred to the commentary. *Id.* at 6 n.4, 15–16 & n.11. Those cases do not parse the phrase itself.

Plus, this legal-term-of-art argument falls flat. Surveying state laws and cases from around the Guidelines' enactment, Judge Eric Murphy found that "dangerous weapon" lacked any "well-established legal meaning that could cover pretending to possess a dangerous weapon." *United States v. Tate*, 999 F.3d 374, 391 (6th Cir. 2021) (Murphy, J., concurring in the judgment). On the contrary, many state courts at the time rejected my colleagues' reading. State legislatures thus had to amend their armed-robbery statutes to reach fake guns. *Id.* at 390–91. The Sentencing Commission could have done the same but chose not to. So there is no basis to stretch the text.

## B. History shows that the Commission did not codify *McLaughlin*

My colleagues claim that after the Supreme Court in *McLaughlin* defined "dangerous weapon" to include something that just looked like a dangerous weapon, the Sentencing Commission adopted that understanding. Maj. Op. 10–13 (citing *McLaughlin v. United States*, 476 U.S. 16, 17 (1986)). But history shows just the opposite.

When the Commission first defined "dangerous weapon" the year after *McLaughlin*, it gave the phrase its ordinary meaning: "an instrument capable of inflicting death or serious bodily injury." U.S.S.G. § 1B1.1 cmt. n.1(d) (1987). As the Commission explained, this definition excluded toy guns. *U.S. Sent'g Comm'n Answers Questions Most Frequently Asked About the Sent'g Guidelines*, 1 Fed. Sent'g Rep. 423, 425–26 (1989)

(Question 36). So at first, the Commission rejected *McLaughlin*'s definition.

Not until two years later did the Commission amend the commentary: "Where an object that *appeared* to be a dangerous weapon was brandished, displayed, or possessed, *treat* the object *as* a dangerous weapon." U.S.S.G. § 1B1.1 cmt. n.1(d) (1989) (emphases added).

The Commission claimed its comment was just "clarify[ing] the definition of dangerous weapon." U.S.S.G. app. C, amend. 71 (1989). My colleagues take this claim at face value. Maj. Op. 14. But calling a Guideline amendment a "clarification" does not make it so. *United States v. Menon*, 24 F.3d 550, 567 (3d Cir. 1994) (rejecting a "clarifying amendment" that punished a defendant "more harshly" than the original Guideline). Rather, we look to what the Commission did, not just to what it said it did. *United States v. Nasir*, 17 F.4th 459, 472 (3d Cir. 2021) (en banc) (Bibas, J., concurring).

By amending the commentary, the Commission impermissibly expanded the Guidelines' scope. *See Tate*, 999 F.3d at 388 (Murphy, J., concurring in the judgment). The original comment followed the plain meaning. But this new comment stretched the text to also reach objects that looked like dangerous weapons. In a later amendment, the Commission admitted doing so. U.S.S.G. app. C, amend. 601 (Supp. 2000) (specifying when "an object that is *not* an actual, dangerous weapon should be *treated as* one" (emphases added)). And that is how we understood this change when we recognized that the Guidelines commentary "equates the image of a 'dangerous weapon' with its reality." *United States v. Dixon*, 982 F.2d 116, 121–24

(3d Cir. 1992) (grounding its holding in pre-*Kisor* deference). In short, as even the Guidelines' author admits, the commentary sets forth a legal fiction, not a fair reading of the text.

### C. Precedent confirms the text's plain meaning

Without text or history on their side, my colleagues rest on a single, inapt precedent—*McLaughlin*. *McLaughlin* read a bank-robbery statute to encompass unloaded guns in part because a gun is a weapon and in part because it is dangerous when used as a bludgeon. 476 U.S. at 17–18. But unlike an empty gun, a fake one can never fire bullets, so it is not "typically and characteristically dangerous." *Id.* at 17. And the government never bore its burden to prove that Chandler's replica was heavy enough to club someone. *Contra* Maj. Op. 20 & n.16 (putting the burden to *disprove* the gun's weight on the *criminal defendant*).

The majority seizes on *McLaughlin*'s other rationale: that an unloaded gun is a "dangerous weapon" because guns provoke fear and violence. 476 U.S. at 17–18. Yet *McLaughlin* never tried to ground that claim in the text. Instead, it cobbled together that functional meaning from the bank-robbery statute's legislative history. *Id.* at 18 n.3. But this rationale shows that *McLaughlin* did not lay down a sweeping rule, but just construed a specific statute. After all, the specific legislative history of an unrelated statute is irrelevant to these Guidelines' meaning. It cannot universally justify stretching the meaning of "dangerous weapon" to reach fake guns. Plus, legislative history no longer carries the weight that it once did. And it cannot muddy clear text. *Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011). So I would cabin *McLaughlin* to the bank-robbery

statute and decline to extend its atextual approach to these Guidelines.

The more instructive precedent deals with the enhancement's text before the 1989 commentary (upheld by bare pre-*Kisor* deference) distorted it. Those cases confirm the text's plain meaning: As two of our sister circuits understood, the enhancement "did not provide for an increase in the offense level based upon the apparent possession of a dangerous weapon." *United States v. Dzielinski*, 914 F.2d 98, 102 (7th Cir. 1990); *accord United States v. Mahler*, 891 F.2d 75, 76–77 (4th Cir. 1989) ("[T]he Sentencing Commission did not contemplate the use of a handgun replica in a robbery."). Both courts recognized that the proper response is not to stretch the enhancement's text, but to depart upward when warranted. *See id.* (both sources). So the relevant precedent confirms the text's plain meaning, refutes my colleagues' broad meaning, and dispels their claim of ambiguity. The only ambiguity here comes from the commentary and improper deference to it.

### D.  If there were any ambiguity, the rule of lenity would trump *Kisor* deference

Even if the Guidelines were ambiguous, the key to the case would be lenity, not deference. We get to *Kisor*'s second step only when the regulation is ambiguous. But before deferring, we must first "empty" the "legal toolkit." *Kisor*, 139 S. Ct. at 2415. As I have explained elsewhere, "[a] key tool in that judicial toolkit is the rule of lenity." *Nasir*, 17 F.4th at 474 (Bibas, J., concurring). And "[t]here is no compelling reason to defer to a Guidelines comment that is harsher than the text." *Id.* So when

we read ambiguous Guidelines, the tie should go to liberty. Here, though, the majority gives the tie to the agency.

Doubling down, my colleagues argue that applying the rule of lenity here does not "make sense." Maj. Op. 22. Yet they understate lenity's benefits and overstate its risks. "[T]he rule of lenity serves our nation's strong preference for liberty." *Nasir*, 17 F.4th at 473 (Bibas, J., concurring). And when used to interpret ambiguous Guidelines, it checks over-punishment, ensuring that "criminal punishment … represents the moral condemnation of the community." *Id.* at 474 (alteration in original) (quoting *United States v. Bass*, 404 U.S. 336, 348 (1971)). That benefit is no less present here than elsewhere.

My colleagues fear that lenity would make all "commentary … superfluous." Maj. Op. 22. Not so. The rule applies only when the commentary "has a clear tilt toward harshness." *Nasir*, 17 F.4th at 474 (Bibas, J., concurring). So it never displaces neutral or defendant-friendly commentary.

They also worry that the rule of lenity "would seem to trump the traditional tools of interpretation" and "render [them] irrelevant." Maj. Op. 21. That fear is baseless. The rule allows for all other "traditional canons of statutory construction" to be applied first. *Shular v. United States*, 589 U.S. 154, 166 (2020) (Kavanaugh, J., concurring) (internal quotation marks omitted). But deference to the Sentencing Commission is not a traditional interpretative tool. Lenity is. So it must come before deference.

The majority mistakenly finds the text ambiguous, then chooses the harsher reading—the very thing barred by the rule

of lenity. But our Court has long favored liberty over commentary that "punish[es] the defendant more harshly than he would have been" under our own "independent interpretation" of the Guidelines. *Menon*, 24 F.3d at 567. If these Guidelines *were* ambiguous, I would follow our preference for liberty and apply lenity to foreclose the harsher reading.

## II.    THE DISTRICT COURT NEVER FOUND THAT CHANDLER KIDNAPPED AND ROBBED THE MAILWOMAN *BECAUSE* SHE WAS A GOVERNMENT EMPLOYEE

My colleagues also go astray on the other sentencing issue. Though they read the government-employee enhancement correctly, they misapply it. As they note, it is not enough for a defendant to *know* that the victim is a government employee. That knowledge must also be part of the reason *why* the defendant committed the crime or targeted the victim. Maj. Op. 26.

But the District Court said nothing about Chandler's motive. As my colleagues concede, "[t]he record with respect to the District Court's finding on Chandler's motive is admittedly scant." *Id.* at 25–26. Even that is an overstatement—the court made no such finding. All it said was that the "postal workers … had their uniforms on and Mr. Chandler knew exactly what he was doing." *Id.* at 26 (alteration in original) (quoting JA 43–44). That line suggests that it thought the enhancement requires only knowledge, not motive. So it never found that the mailwoman's government employment motivated Chandler.

Rather than affirm this enhancement, we should remand for resentencing. The District Court might well choose to canvass the record evidence as my colleagues do, reading it as proof of motive. *Id.* at 27. If it had done so, I would have voted to affirm

this enhancement. But it did not, and we should not speak on its behalf.

\* \* \* \* \*

Text is the touchstone of interpretation. Yet my colleagues skirt the plain meaning of "dangerous weapon," misread precedent, find nonexistent ambiguity, and even then eschew lenity. And they justify the government-employee enhancement by reading speech into the District Court's silence. I respectfully dissent.